**In the Matter of the Petition for Naturalization of Lucien Philippe BOUCHAGE.**

United States District Court
S. D. New York.
Oct. 26, 1959.

888

Bodin, Feldman & Gottlieb, New York City, for petitioner, Alvin Jay Feldman, Harry Sabbath Bodin, New York City,. of counsel.

Howard I. Cohen, New York City, for United States Naturalization Examiner Immigration and Naturalization Service.

BRYAN, District Judge.

Petitioner, a native and citizen of France, filed a petition for naturalization on April 19, 1957 under the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1101 et seq. The Naturalization Examiner has recommended denial of the petition on the ground that on November 16, 1942 the petitioner applied for and was granted relief from training and service in the United States Armed Forces because of alienage under Section 3(a) of the Selective Training and Service Act of 1940 as amended,[1] and was therefore debarred from citizenship un-

1. Section 3(a) of the Selective Training and Service Act of 1940, 54 Stat. 885, as amended, 50 U.S.C.App. § 303(a) [now 50 U.S.C.A.Appendix, § 454], provides:

"Sec. 3(a) Except as otherwise provided in this Act every male citizen of the United States, and every other male person residing in the United States, who is between the ages of eighteen and forty-five at the time fixed for his registration, shall be liable for training and service in the land or naval forces of the United States. Provided, That any citizen or subject of a neutral country shall be relieved from liability for training and service under this Act if, prior to his induc-

der Section 315(a) of the Immigration and Nationality Act of 1952.[2]

The evidence on the hearing before me consisted of the records of the Director of Selective Service and other documents, and the testimony of the petitioner Bouchage. Bouchage's testimony was straightforward and convincing and he impressed me as a man of integrity. I accept his testimony as true and I find the facts to be as follows:

Bouchage was born in France on October 11, 1922 and is now 37. At the time of the invasion of France by Nazi Germany in 1940 he was residing with his parents in their summer home in Brittany. In January 1941 Bouchage and his family managed to escape from Occupied France. He then came to the United States with his parents, was lawfully admitted to permanent residence on February 2, 1941, and has remained a permanent resident since.

Bouchage completed his studies which had been interrupted by the war at the University of California, Santa Barbara Branch, from which he received a bachelor of arts degree in June 1942. While there he duly registered with his local draft board pursuant to the Selective Training and Service Act of 1940.[3]

In October of 1942 Bouchage came east to inquire about a fellowship in comparative literature at Harvard. While he was in the east he went to the Fighting French offices in New York, seeking to enlist in the Fighting French forces which, since the fall of France, had been continuing the struggle against the Ger-

mans. He was told that the Fighting French were setting up an organization and bringing in officers to train forces in the United States at Ft. Benning, Georgia, but were not yet ready to receive enlistments. Petitioner at that time had had no military training since his military class had not been called before he left France. He was requested to keep in touch with the Fighting French headquarters, and left his name with them.

Up to that time, while he had registered with his draft board, Bouchage had received no word or notice from it. When he returned to California about a week later he received the usual selective service questionnaire (DDS Form 40) from his draft board, to be returned by November 2. He duly filled out the questionnaire and filed it on October 31, 1942.

A week later, on November 8, 1942, the allied invasion of North Africa, known as the "Torch" operation, commenced. The difficult diplomatic relations which the United States had been maintaining with the French government were immediately broken by Vichy. Without going into the details of the invasion and the swiftly moving political events which accompanied it, by November 10, 1942 the allied troops were firmly established in French North Africa and General Eisenhower had arranged with General Giraud to be Commander in Chief of the French forces there in cooperation with the Allied forces. On November 11, 1942 President Roosevelt in his Arm-

tion into the land or naval forces, he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President, but any person who makes such application shall thereafter be debarred from becoming a citizen of the United States."

2. Section 315 of the Immigration and Nationality Act of 1952 (8 U.S.C.A. § 1426) provides:

"(a) Notwithstanding the provisions of Section 405(b), any alien who applies or has applied for exemption or discharge from training or service in the Armed

Forces or in the National Security Training Corps of the United States on the ground that he is an alien, and is or was relieved or discharged from such training or service on such ground, shall be permanently ineligible to become a citizen of the United States.

"(b) The records of the Selective Service System or of the National Military Establishment shall be conclusive as to whether an alien was relieved or discharged from such liability for training or service because he was an alien."

3. 54 Stat. 885.

istice Day speech stated that "As a result of recent events—very recent—the United States and the United Nations forces are being joined by a large number of the fighting men of our traditional ally France. On this day, of all days, it is heartening for us to know that the soldiers of France go forward with the United Nations." The next day General Pershing wrote a widely publicized letter to the President appealing to his former French comrades in arms "to form their battalions" and join the ranks of the United Nations in the battle for freedom.

Within a few days, on November 16, 1942, Bouchage, then just turned 20, who had been following these stirring events with enthusiasm, went to his draft board and talked to a member of the board. He told him of his attempt to join the Fighting French forces and explained that with his background and knowledge of both French and English he felt he could be of more value to the allied cause with the Fighting French than with the American forces and would be able to get overseas more rapidly. He said that the French Military Mission had told him that they were about to train troops in the United States but were not yet ready to accept enlistments. He asked how he could obtain permission to serve with the Fighting French instead of with the American forces.

Petitioner was advised by the local draft board member that the only way in which he could be permitted to serve in the French forces rather than with the Americans was to secure relief from the draft and to sign Draft Board Form DDS 301 entitled "Application by Alien for Relief from Military Service", the form prescribed by the Selective Service Regulations for citizens of neutral countries who sought to be relieved under Section 3(a) of the Selective Training and Service Act of 1940 as amended. The form DDS 301 which was presented to the petitioner recited that he was a citizen of France "which is neutral in the present war". It went on to say:

"I do hereby make application to be relieved from liability for training and service in the land or naval forces of the United States under the Selective Training and Service Act of 1940 as amended in accordance with the Act of Congress approved December 20, 1941. I understand that the making of this application to be relieved from such liability will debar me from becoming a citizen of the United States."

Petitioner read the application and inquired whether he could get permission to enlist in the French forces without having to give up his citizenship. He was told that this was not possible and that his only recourse was to make application on Form DDS 301.

The draft board member did not suggest and apparently did not attempt to consult with higher authority or to refer the question to Selective Service Headquarters. Petitioner did not consult with his parents who were in California at the time, or with anyone else. He signed the form then and there on the advice of the draft board member.

On November 24, 1942 he was classified by his local board as IV–C on the basis of his application.

In January 1943 petitioner returned east to take up the fellowship which had been granted him at Harvard. Before doing so, however, he again called at the Fighting French offices seeking to enlist. He was informed that a cadre of escaped French officers was being organized at Ft. Benning to train Fighting French troops but that they were still not ready to accept enlistments.

He then went on to Harvard and during the spring and summer of 1943 worked for his master's degree under his fellowship. However, at least once a month he came to New York to see the Fighting French concerning his enlistment. He also worked as an instructor to enlisted men in the United States Army at Boston University under the specialized army training program. The

salary which he received from this work he turned over to the Free French War Relief.

In September 1943, when he had completed work for his master's degree at Harvard, Bouchage made another of his periodic visits to the Fighting French offices in New York before returning to California. They then, for the first time, accepted his actual enlistment in the Fighting French forces but said they were not yet ready to call him to active duty. On November 1, 1943 his French passport was endorsed with a Free French visa reading "Good to go to North Africa", signed by the Chief of the Delegation of the French Committee of National Liberation. On November 8, 1943 his local draft board issued a permit at the request of the Fighting French forces, permitting him to depart from the United States for French Africa "to serve in the French Armed Forces".

On January 10, 1944 Bouchage was ordered to report for duty at the French Military Mission in New York. After preliminary training in the United States and promotion to sergeant, he was sent to North Africa in the summer of 1944. He served with a French Ordnance Company, took part in the landings in the south of France, served in Alsace-Lorraine, in the Ardennes and through other combat operations, and was designated as an Acting Lieutenant. In August of 1945 he was sent on a mission to the United States as an interpreter. He received an honorable discharge from the French forces and was mustered out in February 1946, after more than two years of service, much of it in combat.

Since then Bouchage has been engaged in responsible business activities here and there is no suggestion that he is not of high moral character or otherwise fully eligible for citizenship. His parents have become American citizens and his sister is married to a Captain in the United States Navy.

Under Section 315(a) of the Immigration and Nationality Act of 1952, 8 U.S. C.A. § 1426(a), which the Government asserts governs this case, citizenship may be barred under two conditions, first, an application for exemption from military service on the ground of alienage, and second, relief from such service on that ground. Citizenship may not be barred unless both conditions are present.

The questions here center about the first condition of ineligibility in the 1952 statute, application for relief on the ground of alienage. There was a similar condition of ineligibility under more stringent Section 3(a) of the Selective Training and Service Act of 1940 as amended, which provided that a citizen or subject of a neutral country might be relieved from liability for training and service if he made application to be relieved, but should thereafter be debarred from becoming a citizen of the United States.

The Examiner recommends denial of citizenship on the theory that since petitioner formally made application to be relieved from military service under Section 3(a) of the Act of 1940 on the ground that he was a citizen of a neutral country, France, and was classified IV–C and relieved from military service on that ground, he is absolutely debarred from the privilege of citizenship under the statute. It is urged that since these two conditions are met the bar imposed by the statute is absolute and neither the surrounding circumstances nor any of the equities can make any difference.

Bouchage, on the other hand, while conceding that he signed Form 301 after reading it, and knew that it contained a provision stating that he would be debarred from citizenship, seeks to be relieved from the effect of the waiver of citizenship upon the theory that he was induced to sign the application and did so upon a mistake of fact induced by the advice of his local draft board member. He urges that in equity and good conscience he should be relieved from the effects of the waiver under the circumstances here.

Petitioner argues that on November 16, 1942, France, or, at least the Fighting French, was not in fact a neutral nation but a co-belligerent of the United

States in the war against the common German enemy; that at that time petitioner was entitled to deferment without surrendering the privilege of becoming a citizen; that at the age of 20, and in the full flush of his enthusiasm for the allied cause and the recrudescence of France as a fighting ally, and his desire to serve with the reconstituted fighting France, he was misled by the draft board member whom he consulted into signing Form 301, and that he therefore signed the form under a mistake of fact induced by an official of the United States government and should not be bound by it.

■ There is no doubt that the signing of an application under Section 3(a) for relief from military service on the ground of alienage does not in all cases debar citizenship. There are grounds upon which one making such an application may be excused from its effects and relieved from the bar.

Thus, in McGrath v. Kristensen, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173, Kristensen, a Danish citizen, made application for relief from service as a neutral alien under Section 3(a). When he made the application he was not a resident of the United States and was therefore not liable for United States military service under the statute. The court said (340 U.S. at page 172, 71 S.Ct. at page 230):

"If Kristensen was not 'residing' at the time of his application for relief, he could not then have had 'such liability' for service. If there was no 'liability' for service the disqualification for citizenship under the penalty clause could not arise because the applicant had not made the 'application' referred to in the statute as 'such application'. 'Such application' refers to an application to be relieved from 'such liability.' As there was no 'liability' for service his act in applying for relief from a nonexistent duty could not create a bar against naturalization. By the terms of the statute, that bar only comes into existence when an alien resident liable for service asks to be relieved."

It was held that he was not debarred from citizenship by making the application.

In Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729, petitioner, a Swiss national, applied for and received exemption from military service as a neutral alien under Section 3(a). Moser had signed a revised Form 301 which omitted the statement "I understand that the making of this application to be relieved from such liability will debar me from becoming a citizen of the United States". A footnote on the revised form, however, quoted pertinent parts of Section 3(a). This form had been supplied him by the Swiss Legation after it had protested to the State Department that Section 3(a) was inconsistent with the treaty rights of Swiss citizens. The Swiss Legation had then negotiated an agreement upon the revised Form 301 which omitted the quoted waiver.

It was held that Moser was not debarred from citizenship despite the footnote reference to the statutory provision in the application which he had signed. The court said (341 U.S. at page 47, 71 S.Ct. at page 556):

"Petitioner did not knowingly and intentionally waive his right to citizenship. In fact, because of the misleading circumstances of this case, he never had an opportunity to make an intelligent election between the diametrically opposed course required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness. Johnson v. United States, 318 U.S. 189, 197, 63 S.Ct. 549, 553, 87 L.Ed. 704. To hold otherwise would be to entrap petitioner."

In In re Gourary's Petition, D.C.S.D. N.Y., 148 F.Supp. 140, petitioner, a native and citizen of Austria, and therefore

an enemy alien, signed Form 301 applying for exemption from military service as a neutral alien under Section 3(a). He was held not to be debarred from citizenship, since as he was an enemy alien, he was not entitled to the exemption from military service afforded a citizen of a neutral country under Section 3(a). His Form 301 application for such relief was held to be void and of no effect.

The court noted that petitioner's local board had proceeded in disregard of instructions from Selective Service Headquarters, and held that its purported grant of exemption upon his application was a nullity and that he was not bound by the waiver.

In Petition of Ajlouny, D.C.E.D.Mich., 77 F.Supp. 327, petitioner, a native and citizen of Palestine, sought relief from military service by filing a Form 301 application under Section 3(a) asking for relief as a citizen of a neutral country. The court held that Palestine was not a neutral country but a co-belligerent and that therefore petitioner's application for relief was in all respects a nullity and did not bar citizenship.

In Petition of Meng Chung Yang, D.C. D.C., 171 F.Supp. 898, 899, petitioner, the holder of a Nanking passport, was admitted upon a student visa and pursued his studies in the United States. He was therefore entitled to be placed in Class IV–C under Selective Service Regulations then in force. Nevertheless, he made application to be relieved from military service by filing S.S. Form No. 130. Under the Universal Military Training and Service Act this form stated that petitioner understood that he would "thereafter be debarred from becoming a citizen of the United States".

The court held that petitioner was not debarred from citizenship on the dual grounds that in view of language difficulties he did not fully understand the nature of his act and that he was in any event entitled to be classified as IV–C because of his student status, and was therefore under no legal duty to execute the form in order to obtain relief, analogizing the situation to that in McGrath v. Kristensen, supra.

The Government contends that none of these cases are controlling here and urges that In re Skender's Petition, 2 Cir., 248 F.2d 92, certiorari denied Skender v. United States, 355 U.S. 931, 78 S.Ct. 411, 2 L.Ed.2d 413, and United States v. Kenny, 2 Cir., 247 F.2d 139, require the denial of the petition.

In the Skender case petitioner, a citizen of Iraq, then a neutral nation, in forwarding his questionnaire to his local draft board, specifically requested that the board forward him DDS Form 301 so that he could make application for relief from military service as a neutral alien. He received and filed such a form and was classified by his board as IV–C. The classification was not made until nine days after Iraq became a co-belligerent. He was thereafter reclassified as 1–A but protested to his local board against such classification and took an appeal on the ground that his application under Form 301 gave him a vested right to be relieved from service. As the district court said "The whole record is replete with the efforts of this man to keep out of the army."

The Court of Appeals affirmed the judgment of the district court denying the petition for naturalization. It said in substance that debarment from citizenship was not unduly harsh under the circumstances, and that it was not open "to the appellant to attack the * * * very classification which he sought on the ground that it gave him an exemption to which he was not entitled" [248 F.2d 96].

In the Kenny case the application for relief from military service took place in 1953 and 1954, long after the end of the war. When called for induction petitioner, an Irish citizen who had joined the National Guard, wrote to his local board applying for exemption as a citizen of Ireland and was classified as IV–C. He claimed to have been under the mistaken belief that he was entitled to exemption from the draft without impairing his eligibility for citizenship be-

cause of his service in the National Guard, and the court below so found.

However, he was expressly notified by his draft board, some five months after his deferment, of the provisions of Section 315(a) of the Immigration and Nationality Act of 1952 concerning his permanent ineligibility to become a citizen of the United States upon application for and grant of exemption from military service. Yet he never thereafter asserted a claim to be relieved from the bar of Section 315(a) until the hearing of his naturalization petition, when he testified that the only reason he had signed the application was "because I was in the National Guard and I thought that was covering me". Even after his National Guard service had terminated he continued to enjoy exempt status under his IV–C classification for another year.

The Court of Appeals reversed the district court [4] which had admitted him to citizenship and denied his petition.

The Skender and Kenny cases stem from and rely upon Mannerfrid v. United States, 2 Cir., 200 F.2d 730, 732, certiorari denied 345 U.S. 918, 73 S.Ct. 729, 97 L.Ed. 1351. There petitioner was a Swede who had come to the United States as a business visitor in 1941 and had his time to remain here successively extended until 1949 when he was admitted as a permanent resident. He made an application for exemption from military service in 1943 on the ground that he was a neutral alien and the application stated that he understood that this would debar him from American citizenship. He claimed to have been under the erroneous impression that military service would forfeit his Swedish citizenship or make him a citizen of the United States which would adversely affect his business and property interests in Sweden. In affirming the order of the district court denying Mannerfrid's petition for citizenship on the ground that he was barred therefrom under Section 3(a) of the Selective Training and Service Act

of 1940, Judge Learned Hand, referring to the Moser case, said that

" * * * § 3(a) does not make a claim for exemption an absolute bar to naturalization; and that it will not do so, if the alien has been misled even by a third person (as Moser was by the Swiss Legation), if he has been so deprived of a fair chance to make an intelligent choice between exemption and the forfeiture."

He held that the mistake which induced Mannerfrid to make the claim was a "collateral" one since he was not deceived as to whether his application would forfeit his right to be naturalized but merely as to the consequences of not making it.

He went on to say that to hold that Mannerfrid's mistake would relieve him of the consequences of his application

" * * * would be no more than a further step of the lenity that the Court exercised in Moser v. United States, supra, and that the difference is one of degree; but that is so often the determining factor in situations of this kind, that we need not support its propriety if the difference in degree be wide enough. We can say no more than that we do not believe that Congress would have tolerated the necessary laxity in this instance."

The case at bar does not fix within the four corners of either the Moser or Kristensen cases or the other cases which grant relief from debarment from citizenship because of mistake. On the other hand, it is distinguishable from Skender, Kenny and Mannerfrid in which such relief was denied. As Judge Hand pointed out, the difference between the two lines of cases is one of degree. In Skender and Kenny, as in Mannerfrid, the court felt that the difference in degree was too wide to support a holding that relief should be afforded the petitioner under the facts.

4. But see comment in Brunner v. Del Guercio, 9 Cir., 259 F.2d 583, 586, note 3.

Here, however, it seems to me that "the lenity that the Court exercised in Moser v. United States" [200 F.2d 733] should be exercised even though it may require a "further step", I do not conclude here, as Judge Hand concluded in Mannerfrid, that Congress would not "have tolerated the necessary laxity in this instance". Nor do I believe that Congress intended that one in the situation of this petitioner should be forever barred from citizenship.

There is no doubt that Bouchage, a non-declarant alien, signed Form DDS 301 under a mistake as to his rights, and that he was misled into so doing to his detriment by the member of the draft board upon whom he relied for advice.

Whatever the technical legal position may have been at the time the petitioner made his application on November 16, 1942, the status of France and of the Free French or Fighting French forces under the command of General De Gaulle, and those under the command of General Giraud, was in a state of confusion. Up to the time of the North African invasion of November 8, 1942, the United States had maintained diplomatic relations with the Vichy government of Marshal Petain. Great Britain, on the other hand, had refused to recognize Vichy and had recognized and was supporting General De Gaulle and the Free French movement. Despite its diplomatic relations with Vichy, however, the United States had permitted the Free French Military Mission to maintain offices in the United States and lendlease aid had been given to the Free French as early as November 1941.

Vichy broke diplomatic relations with the United States on November 8, 1942 when the invasion of North Africa occurred. Three days later German troops occupied all of continental France in violation of the Franco-German Armistice of June 1940.

Nine months prior to these events, on February 2, 1942, the then Secretary of State had written to the Director of Selective Service asking him to grant a request of the French National Committee in London that members of the Free French movement in the United States be given the opportunity of service in the Free French forces without incurring the penalty of being debarred from American citizenship. On February 9, 1942 the Director of Selective Service wrote to the Secretary of State advising him as follows:

"This headquarters recognizes the problem presented in this instance and desires to cooperate with the Department of State in providing means whereby aliens liable to military service in this country and the desire to serve with the Free French forces may do so without being debarred from American citizenship.

"It is the opinion of this headquarters that registrants who join the Free French Military Forces prior to the mailing of the order to report for physical examination by the armed forces prior to induction (DDS Form 150–A) may be deferred from military service under the Selective Training and Service Act of 1940 as amended."

Apparently this was not communicated to local boards, nor made the subject of a local board release. Local Board Release No. 112, dated September 29, 1942, and in effect on November 16, 1942, when petitioner signed Form 301, listed as "neutral" "France and possessions except those under Fighting French authority". It made no mention of the opinion of the Director of February 9, 1942, and neither France nor the Fighting French were listed as co-belligerents. Local Board Memorandum No. 129 issued May 2, 1942, dealing with optional service by non-declarant aliens in armed forces of co-belligerent nations, did not list France or the Fighting French as co-belligerents either.

On January 22, 1943 the legal advisor of the Secretary of State wrote to the Director of Selective Service stating that the Department was in entire sympathy with a proposal by the War Department that "French nationals in the United States who desire to join the military

forces of the Fighting French Delegation or of the French Military Mission, could be accorded the same treatment to which nationals of co-belligerent countries are entitled under reciprocal induction agreements which have been concluded". In reply thereto the Director of Selective Service wrote to the Secretary of War "In accordance with your request of January 21, 1943, this headquarters is arranging to instruct local boards that French Forces have all rights accorded to co-belligerent nations under the reciprocal induction agreement". He added "We do not anticipate that our local board release will become effective for some time, but we are writing individual letters to take care of particular cases presented to us by the Military Attache of the French Forces." The local board release covering this policy decision seems not to have been made until March 1, 1943 when Local Board Memorandum 129 originally issued on May 2, 1942, dealing with optional service by non-declarant aliens in armed forces of co-belligerent nations was amended to include the Fighting French and the High Commission of North Africa.

■ Thus, on November 16, 1942, under the arrangements made on February 9 of that year between the State Department and the Director of Selective Service, French citizens who joined the Fighting French Military Forces were entitled to special consideration as a matter of United States Government policy, and might be deferred from United States military service if they joined the Free French prior to the mailing of the order to report for physical examination.

There is nothing to indicate that the petitioner, had he been advised of the opinion of the Director of Selective Service, could not have had his enlistment accepted by the Fighting French prior to the time when he was called for induction. Nor is there any indication that he would have been called for induction prior to the formal recognition of the Fighting French forces as co-belligerents by the Director of Selective

Service on January 21, 1943, only two months later.

When the *de facto* recognition of the Fighting French as allies, extended by the President in his speech of November 11, 1942, was formalized by the Director of Selective Service on January 21, 1943, the petitioner would then have been able to make "application for induction into the armed forces of a co-belligerent nation" (Form 502), to wit, the Fighting French, as recognized by the Director and as listed in the amendment to Local Board Memorandum No. 129 which was published on March 1, 1943. Such an application would have been forwarded in due course to the Fighting French forces who would in turn have been able to file a co-belligerent notice of acceptance and report of induction oath (Form 503) and petitioner would have been exempted from service in the United States forces without any bar against future citizenship.

Petitioner urges that France, or at least the Fighting French, were not, as a matter of law, neutral on November 16, 1942; that therefore petitioner had no right to apply for relief as a neutral alien; and that his application should therefore be treated as a nullity, as it was treated in the somewhat analogous situation presented in In re Gourary's Petition, supra. There is doubt as to whether the federal judiciary has the power to determine this question and whether I may go beyond the official documents promulgated by the appropriate executive departments which were in force and effect at that time. See Brownell v. Rasmussen, 98 U.S.App.D.C. 300, 235 F.2d 527, 530; United States v. Bussoz, 9 Cir., 218 F.2d 683. But cf. Petition of Ajlouny, supra. It is, however, unnecessary to resolve that question here, for I rest my decision on somewhat different grounds.

The fact is that the 20 year old Bouchage was misinformed by the local draft board member who advised him of his rights in the premises, and signed Form DDS 301 applying for relief from United States military service under a complete

misapprehension as to what course he was entitled to pursue. In my view the misapprehension under which he labored, induced by an official of this government charged with the administration of the Selective Service Act, was such a mistake as entitles him to be relieved from the debarment of citizenship which would otherwise result.

Whether or not the declared policy of the Director of Selective Service to grant special consideration to French citizens who wished to serve in the Fighting French forces was known to the local draft board member, or whether he was in ignorance of the determination of the Director, makes no difference. Bouchage, plainly eager to get into combat against the joint enemies of his own country and the United States, was erroneously informed that there was no way open for him to follow his natural desire to fight with his compatriots other than to sign Form 301. The draft board member who advised him made no suggestion of an appeal to higher authority, nor did he refer the question to the Director of Selective Service. It may be noted that this was only five days after the President had welcomed the Fighting French forces as allies and had rejoiced that France would again march hand in hand with the free world. The draft board member must have been aware of these events and that the President of the United States had encouraged French citizens to fight with their own forces in the common enterprise.

The Director of Selective Service had already taken steps to make it possible for them to do so without losing their citizenship, and very shortly thereafter had issued a directive carrying out the President's declaration of *de facto* cobelligerency.

It is also of significance that Bouchage was but 20 years of age at the time and was spurred toward what he did by the contemporaneous events which had stirred the free world, and did not even have an opportunity to consult his parents. These facts are a further indication of the effect upon him of the misrepresentations of an officer of this Government who either was misinformed or was too indifferent to ascertain the true picture.

It is true that Bouchage knew that the application contained the clause stating that he understood that by making the application he was debarred from citizenship. But it would be difficult, indeed, to say upon the facts here that he knowingly and intelligently meant to take the portentous and disastrous step of making a waiver for all time of his right to become a citizen of the United States, considering his age, his emotional patriotism, the setting of the events which were contemporaneously occurring, and the misapprehensions under which he labored.

The mistake here was not merely collateral, as in the Mannerfrid case. It was directly and intimately related to the actual signing of the Form 301 application which took place immediately after, and was specifically induced by, the incorrect and misleading information given to this youth by his draft board member on which he relied and was entitled to rely.

Here, as in Moser, Bouchage "never had an opportunity to make an intelligent election" [341 U.S. 41, 71 S.Ct. 556] between the diametrically opposed courses required as a matter of strict law. There was no intelligent waiver of his privilege of citizenship as a result of such an intelligent election.

Under the circumstances, to impose so serious a penalty on one who was a minor for signing the application under mistake as to his rights induced by a duly constituted officer of this government, would not, in my view, be in accordance with the declared overall policy of the executive branch or with the intent of Congress in enacting the governing legislation. To hold that Bouchage is debarred from citizenship under these facts would be to entrap him just as surely as the Supreme Court held that the petitioner would have been entrapped in the Moser case.

Thus, I hold that the Form DDS 301 signed by the petitioner on November 16, 1942 should be set aside and declared null and void and of no effect.

The petitioner therefore has not waived his right to citizenship and is not debarred therefrom. His petition for naturalization is granted.

It is so ordered.