Petition for **NATURALIZATION OF Dietrich Friedrich KOPLIN,** Petitioner.

No. 17874.

United States District Court
D. Colorado.
April 10, 1962.

Lee, Bryans, Kelly & Stansfield, Robert F. Thompson, Denver, Colo., for petitioner.

Paul X. Moran, Examining Officer, United States Department of Justice, Immigration and Naturalization Service, Denver, Colo.

DOYLE, District Judge.

The instant application for naturalization arises under Section 316(a) of the Immigration and Naturalization Act (Title 8 U.S.C.A. § 1427).

The important question posed is whether the petitioner was rendered permanently ineligible to become a citizen as a result of his executing, in August, 1953, an application for and receiving an exempt military service status of IV–C as a resident alien pursuant to the terms of 8 U.S.C.A. § 1426.

As a basis for his request for relief from the consequences of his having asserted his alienage, petitioner contends:

I. That the claim for exemption (Exhibit 9), was executed as a result of coercion exerted by the circumstances. In essence, he urges that he entered the military service in Germany at age fifteen, was exposed to two years of extreme combat conditions, followed by three years of suffering and privation in an English prison camp; that because of this exposure he was psychologically unfit to accept the order to enter military service, and that he was thus required to elect between signing a request for exemption or suffering prosecution and possible imprisonment. A free choice execution of the exemption was, according to the argument, prevented.

II. That he signed the exemption under a misapprehension as to the facts and legal consequences which would result from the claim of exemption. On this he contends that while he was aware that the claim of exemption would complicate his application for citizenship, he had no realization that its effect was to forever bar him from citizenship; that he had limited knowledge of English and that the waiver was presented to him the

day he signed it so that he had no opportunity to have it translated.

Petitioner was lawfully admitted to the United States on September 19, 1950. He was sponsored by an uncle, a farmer who resides at Cornish, Colorado, and he worked on his uncle's farm for approximately one year. For the next year and one-half, he was employed in Windsor, and in Greeley, Colorado. In May, 1954, he went to work for the Public Service Company of Colorado as an electrician at its Valmont plant in Boulder. During the interval from 1954 to 1957, he studied electrical engineering at the University of Colorado and is now employed by the Public Service Company as an Electrical Engineer. He was married September 25, 1954, and has three children.

Before petitioner came to the United States, he talked to the United States Consul at Hamburg, and was assured that he would not be required to serve in the Armed Forces for a period of at least five years after arrival and until he became a United States citizen. Indeed, at that time the law was in accord with this advice. The Treaty of 1924 exempted German nationals from military service without the necessity of signing claims such as that in question. However, in April, 1953, this was changed by an executive order which required German nationals to expressly *claim* exemption from U. S. military service. In any event, petitioner did not register until he was ordered to do so by the F.B.I. on December 4, 1952. Nevertheless, pursuant to the old law, petitioner was first (on February 4, 1953) placed in a IV–C classification. After the April change in the law, petitioner's classification was changed to I–A, he being no longer entitled to the IV–C as a treaty national. Petitioner submitted a formal appeal of his classification on June 16, 1953 and appeared for his pre-induction physical on June 25. On July 2, 1953, he forwarded an appeal to the Colorado State Board, but this application was denied and an order of induction was issued July 30, 1953. Thereafter, on August 4, 1953, petitioner appeared and on that same day signed a form which was prepared by the Clerk at the time. He maintains that he did not understand the contents of this form despite the fact that the body of his application contained the statement that he had read the provisions of Section 315 of the Act, and under his signature both subsections (a) and (b) of Section 315 (Title 8 U.S.C.A. § 1426) were quoted. The exact words of waiver contained in this section state that any person who applies for exemption, "shall be permanently ineligible to become a citizen of the United States."

The Secretary of the Board testified that in her opinion petitioner understood what he was signing; she further stated that she had not explained the provision of the Act to petitioner, but said that she had read it to him and was sure that he understood it.

There is strong evidence that petitioner's knowledge of English was limited. The testimony of a friend, a Mr. Efkin, a naturalized citizen, who had come from Germany many years earlier, established this beyond question. He stated that petitioner could speak and understand simple, or elementary English, but that he needed an interpreter beyond this stage and Mr. Efkin, as his adviser, during the period that he was processing appeals from the Selective Service Board, conversed with petitioner in German and wrote in English the letters that petitioner later signed. Efkin's opinion was that petitioner did not understand at the time of signing Exhibit 9 that it would result in his becoming permanently ineligible for citizenship. This was based on petitioner's limited knowledge of English and on the fact that petitioner was most anxious to become a citizen and he would not have signed a waiver had he been aware of the consequences.

During this period just prior to the signing of the waiver petitioner was in communication with the German Consul in Kansas City and the letter of the Consul to the petitioner, as interpreted by Efkin, is in the record. That letter informed petitioner of the change in the law and warned him that a request for an

exemption would result in "quite a few difficulties at the time he wishes to become a citizen." The letter also stated that the subject was being negotiated with the State Department.

Petitioner testified that he did not understand that the exemption claim called for permanent ineligibility for citizenship, although he admitted that he realized that it would create difficulties.

Additional testimony was taken at the request of the Immigration Service after the close of the first hearing. The witnesses called were Roland E. Palmquist of Windsor, Colorado, and Karl Gustav Will, the uncle of petitioner. Palmquist testified that during the month of September, 1952, petitioner was employed by him as an electrician. He stated that petitioner conversed with him in English and was able to understand sufficiently to enable him to perform his duties. According to Palmquist, petitioner stated that he would return to Germany if called upon to serve in the Armed Forces.

Mr. Will testified that petitioner lived in his home when he arrived in this country and that he had frequent conversations with him; that most of these were in English, although Will admitted that German words were interspersed with the English. Petitioner also told Will that he would not enter the Armed Forces and once, according to Will, stated that "wild horses couldn't make him join." Will's dislike for the petitioner was quite manifest and he said it was based upon petitioner's unwillingness to go into the Army; but, it was also apparent that Will resented the fact that petitioner did not work hard while on the farm.

Rebuttal testimony was offered by the petitioner. Mr. Philip Kaler's testimony was that petitioner lived in his home during 1953 and that he conversed with him in English and in German at regular intervals. Kaler said that petitioner's English was quite limited and that difficult words had to be interpreted for him.

Harold Bauming, of Greeley, testified to the same effect. Petitioner worked for Bauming during 1953 and most of their conversations were in German. Bauming stated that petitioner would have been unable to understand such words as "permanently ineligible."

The Immigration Service has not determined that petitioner *actually* knew that he would be forever ineligible for citizenship—its finding was that petitioner "must have known" from the surrounding circumstances the consequences of signing Exhibit 9. Even assuming that this finding is adequate, it does not appear sufficient inasmuch as the only evidence other than that which was given at the last hearing which directly supports it is that of the Secretary of the Draft Board, and this was merely an opinion. The conclusion which the evidence supports is that petitioner was aware of the existence of difficulties in obtaining his citizenship resulting from the signing and there is no evidence whatsoever to support a conclusion of intent to renounce citizenship. It is more logical and consistent with the evidence adduced at the first hearing to find and conclude that petitioner did not comprehend the final and irrevocable character of the waiver. This more reasonable conclusion is founded upon his limited knowledge of the English language and his strong desire at the time to become a citizen. Had Efkin been present when petitioner signed Exhibit 9, and had he translated and explained it, there would now be no room to question the extent of his knowledge; or, had the Secretary of the Selective Service Board explained to petitioner that the signing of the application constituted a test of his loyalty to the United States or an election as to his allegiance and that his signing constituted a declaration of his continued loyalty to his homeland and a disclaimer of loyalty and allegiance to the United States, we would be justified in now holding that he waived his citizenship intelligently. In view, however, of the technical nature of the statutory form, of his limited knowledge of English, the pressure under which he was acting, together with the admitted fact that the form was not explained to petitioner but was merely read to him, it is not possible to conclude that the in-

stant signing was an informed and knowledgeable waiver of rights.

The question remains whether petitioner makes a case for relief by showing a lack of full understanding of legal consequences which attended this claim.

The pertinent statutory provision is Section 315(a) of the Naturalization Act, Title 8 U.S.C.A. § 1426(a):

"Notwithstanding the provisions of section 405(b) of this Act, any alien who applies or has applied for exemption or discharge from training or service in the Armed Forces or in the National Security Training Corps of the United States on the ground that he is an alien, and is or was relieved or discharged from such training or service on such ground, shall be permanently ineligible to become a citizen of the United States."

Surprisingly, the courts have construed this provision so as to require that the waiver be made with intelligence and knowledge. Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729; In re Planas, D.C., 152 F.Supp. 456 (1957). The apparent reason for departing from the general rule that one is presumed to know the law and that signing of a document such as this concludes the matter, is the fact that such waiver forms are usually executed by aliens who have little understanding of our customs, mores, law and language, and who are thus apt to lack a realization that by a stroke of the pen they are forever renouncing a most precious status. Machado v. McGrath, 89 U.S.App.D.C. 70, 193 F.2d 706.

In Moser v. United States, supra, the Supreme Court of the United States first established a standard for gauging whether the waiver was an intelligent one. In that case, the Supreme Court, speaking through Mr. Justice Minton, said:

"There is no need to evaluate these circumstances on the basis of any estoppel of the Government or the power of the Swiss Legation to bind the United States by its advice to petitioner. Petitioner did not knowingly and intentionally waive his rights to citizenship. In fact, because of the misleading circumstances of this case, he never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness. Johnson v. United States, 318 U.S. 189, 197, [63 S.Ct. 549, 553, 87 L.Ed. 704]. To hold otherwise would be to entrap petitioner."

In citing Johnson v. United States, Judge Minton was comparing this waiver to the waiver of the privilege against self-incrimination and this analogy has been followed in subsequent cases.

In Ballester Pons v. United States, 220 F.2d 399 (1 Cir., 1955), the Court recognized the standard of "intelligent waiver" and evaluated the Moser decision in these words:

"* * * But the Supreme Court read into § 3(a) the implication that the bar to naturalization would not operate until the alien had made an intelligent choice between the alternatives presented, well knowing the legal effect of what he did. * * *"

In Brunner v. Del Guercio, 259 F.2d 583 (9 Cir., 1958), there was a reversal because of the failure of the Board of Immigration Appeals to "find that Brunner knowingly and intentionally waived his rights to citizenship when he executed the Selective Service form."

Machado v. McGrath, 193 F.2d 706 (D.C.Cir., 1951), also recognized the significance of the Moser decision, and added this comment:

"* * * The sound reason for affording such an opportunity arises in good part from our conviction that American citizenship being a most precious right, its denial should not be allowed to rest upon a doubtful premise. Upon similar reasoning, it should not be allowed in this case to rest upon the narrower view of the

allegations of the complaint. We hold that appellant is entitled to a responsive pleading on the issue of mistake."

Numerous of the more recent district court cases have also had occasion to apply it. See, for example, In re Bouchage's Petition, 177 F.Supp. 887 (S.D.N.Y. 1959), Petition for Naturalization of Meng Chung Yang, 171 F.Supp. 898 (D.C. 1959); In re Planas, supra.

In the latter case the applicant understood the words contained in the exemption form, but he was there assured by the Board that the signing of it would not prejudice him. The District Court for the District of New Jersey, William F. Smith, Judge, said:

"We are of the opinion that despite the minor differences in the facts of this case and the facts of the Moser case, supra, that the situations are comparable. The Court in the Moser case, supra, after a review of the facts, held at page 47 of 341 U.S., at page 556 of 71 S.Ct.: '* * * because of the misleading circumstances of this case, he [the petitioner] never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness.' We are of the opinion that this principle must be applied here. The circumstances surrounding the present petitioner's application for exemption from military service were misleading and he was thereby denied the opportunity of making the 'intelligent waiver' which the Court in the Moser case, supra, held 'is required by elementary fairness.'"

Applying the doctrine in the Moser case to the case at bar, it must be concluded that the evidence does not show an intelligent and informed waiver of citizenship.

Petitioner's situation was quite confused. First, he was subjected to the law change in April, 1953, just prior to his selective service call; and, secondly, he was advised by the German Consul that the matter of whether the German Treaty of 1924 would be recognized was still in negotiation and although petitioner was told that execution of a claim for exemption would create difficulties when his citizenship came up, he was not advised that the claim would result in permanent ineligibility.

The final question is whether the evidence presented at the hearing on April sixth demands that a different view be taken as to petitioner's capacity to understand the nature of the waiver which he was signing. It must be concluded that this evidence does not establish that petitioner knew and understood the significance of the claim for exemption. The gentlemen added to the testimony in the record that petitioner did not desire to serve in the Armed Forces. However, they added nothing which could aid in a determination of whether the waiver was an informed one. Moreover, the vehemence of Mr. Will's protest undermines it very considerably and leads the Court to believe that his attitude results, to some extent, from personal animosity.

It is fair to conclude that the petitioner's level of knowledge of the consequences of the claim of exemption did not exceed the information given to him by the German Consul because his limited knowledge of the English language would not permit him, without help, to assimilate the terms and conditions set forth in the waiver in the short period available to him; in other words, petitioner executed the claim under a misapprehension as to its meaning and consequence and under these circumstances it cannot be considered "an intelligent election between the diametrically opposed courses required as a matter of strict law," and it does not appear that he "knowingly and intentionally waived his rights to citizenship." That being so, the record does not support a determination of denial of citizenship.

It should be noted that the only issue before the Court was the validity of the claim of exemption. The Court is, there-

**38**

fore, limited in its comments to this issue. Nevertheless, there have been overtones and undertones suggesting that petitioner lacks loyalty, that he may be selfish and materialistic, that he may be motivated by these factors rather than idealistic considerations in seeking citizenship. The Court does not feel justified in pursuing these suspicions and conjectures inasmuch as the statements attributed to petitioner occurred almost ten years ago and the utterances might well have been made in anger and could have been mere emotional outbursts. In any event, they do not warrant in and of themselves, a determination or even a further inquiry concerning the worthiness of the petitioner.

The petition for naturalization should, therefore, be granted, and it is directed that an appropriate order be presented.