MATTER OF R—E—

In EXCLUSION Proceedings

A–11987584

*Board Decision November 14, 1961*
*Commissioner's Request for Certification December 1, 1961*
*Board Decision March 13, 1962*
*Attorney General Decision June 18, 1962*

Excludability—Section 212(a)(22), 1952 act—Ineligible to citizenship—Burden of proof for one claiming "Moser" exception.

(1) A Mexican national was classified as available for military service by his local draft board; sought advice from, and was informed by, the Mexican Consulate that he did not have to serve; was advised by the Consulate to file DSS Form 301 which was filled out at the Consulate and filed by him with the local draft board. He did not read the contents of DSS Form 301, nor were the consequences thereof made known to him. *Held:* The alien was unaware that he would become ineligible to citizenship by signing the DSS Form 301, and did not, therefore, knowingly and intentionally waive his rights to citizenship within the doctrine of *Moser* v. *United States*, 341 U.S. 41.

(2) Attorney General's decision states: "In any event, I do not understand the Board's decision to establish a rule of proof for other cases, nor does this decision affirming it do so."

EXCLUDABLE: Act of 1952—Section 212(a)(22) [8 U.S.C. 1182(a)(22)]—Ineligible to citizenship.

**BEFORE THE BOARD**
**(November 14, 1961)**

**DISCUSSION:** On May 22, 1961, we sustained the alien's appeal and directed that he be admitted as a returning resident. The case is now before us pursuant to a motion for reconsideration dated June 9, 1961, which has been filed by the Service.

The applicant is a 52-year-old married male, native and citizen of Mexico, who was admitted to the United States for permanent residence on March 31, 1960. On August 6, 1960, after an absence of a few hours in Mexico, he applied for admission as a returning resident and was excluded by a special inquiry officer on the ground stated above. He had previously resided in the United States from

about 1922 until about November 1942. On May 25, 1942, he executed DSS Form 301, and the local draft board exempted him from service by reason of alienage and classified him as IV-C on May 27, 1942. He was reclassified as I-A on August 4, 1943.

In our previous order, we stated that it was unnecessary to discuss certain contentions of counsel in view of our conclusion. Since two of counsel's contentions would require a ruling before we could grant the request of the Service that the appeal be dismissed, these contentions will be discussed later herein. However, the principal issue in this case is whether the applicant is ineligible to citizenship under section 315 of the Immigration and Nationality Act of 1952 (8 U.S.C. 1426).

We have carefully reviewed the entire record. In our previous order, we summarized the applicant's testimony concerning the circumstances surrounding the execution of the application for exemption from military service. He testified that, upon receiving a notice to appear for a medical examination, he went to the Mexican Consulate for advice and was informed that he was not obligated to serve in the Armed Forces of the United States and that he should obtain DSS Form 301 from his draft board. He obtained the Form and took it to the Mexican Consulate where it was filled out and he then signed the Form before an employee of the draft board. He was positive in his testimony that he did not read the Form; that no one at the Mexican Consulate or at the draft board informed him that the signing of the application would bar him from becoming a citizen of the United States; and that no statement whatever was made to him that this application would have any effect upon his eligibility for citizenship. He testified that he would not have signed the Form if he had known that such action would bar him from becoming a citizen.

It was stated in our previous order that the applicant would be ineligible to citizenship under 8 U.S.C. 1426 unless his case was within the rule stated in *Moser* v. *United States*, 341 U.S. 41 (1951), and we reached the conclusion that the case was within the rationale of that decision. In its motion, the Service seeks to distinguish the applicant's case from that of Moser by saying, "Moser went to his consulate and was specifically told that he would *not* become ineligible upon signing." This is not correct. The one statement along that line which the Swiss Legation made to Moser in its letter of February 18, 1944, was: "Please note that, through filing of DSS Form 301, revised, you will not waive your right to apply for American citizenship papers. The final decision regarding your naturalization will remain solely with the competent naturalization courts."

The Service cited *Kahook* v. *Johnson*, 273 F.2d 413 (C.A. 5, 1960), which will be discussed later, and four district court decisions. It

was stated that these decisions plainly indicate that the applicant's case is distinguishable from *Moser* and that "the great weight of legal authority in this area has not been followed by the decision of the Board." Actually, whatever legal question formerly existed was authoritatively answered by the Supreme Court's decision in the *Moser* case. Since that time, the inquiry is whether or not the facts of the particular case bring it within the *Moser* rule. The four district court decisions cited by the Service are *Petition of Miranda*, 111 F. Supp. 481 (E.D. N.Y., 1953); *In re Pinto's Naturalization*, 152 F. Supp. 892 (S.D. N.Y., 1957); *In re Calvo's Petition*, 161 F. Supp. 761 (D.C. N.J. 1958); and *Petition for Naturalization of Rodrigues*, 193 F Supp. 150 (N.D. Cal., 1961). In each of these, it was held that the alien *was not* within the rule set forth in the *Moser* case and that he was ineligible to citizenship. A decision to the same effect is *Keil* v. *United States*, 291 F.2d 268 (C.A. 9, 1961). A contrary conclusion to the effect that the alien *was* within the *Moser* rule was reached in each of the following cases: *Machado* v. *McGrath*, 193 F.2d 706 (C.A. D.C., 1951), cert. den. 342 U.S. 948; *Petition of Berini*, 112 F. Supp. 837 (E.D. N.Y., 1953); *Petition of Sally*, 151 F. Supp. 888 (S.D. N.Y., 1957); *In re Planas*, 152 F. Supp. 456 (D.C. N.J., 1957); and *In re Bouchage's Petition*, 177 F. Supp. 887, 897 (S.D. N.Y., 1959). *Machado* v. *McGrath*, *supra*, which was decided a few months after *Moser*, differs factually in some respects from the applicant's case, but it shows that the *Moser* rule is not limited to precisely identical factual situations. We believe it is clear from the foregoing that no legal question is involved in this applicant's case. Instead, there is only the question of whether, under the facts of his case, he does or does not come within the legal rule enunciated in the *Moser* case. If he is within that rule, then the DSS Form 301 filed on May 25, 1942, does not bar him from citizenship.

In *Moser* v. *United States*, *supra*, at page 47, the court said: "Petitioner did not knowingly and intentionally waive his rights to citizenship. * * * he never had an opportunity to make an intelligent election between the diametrically opposed courses * * *. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness." In three of the cases in which the courts held that the aliens were ineligible to citizenship (the *Pinto* and *Rodrigues* cases, cited by the Service, and the *Keil* case), the courts made statements, nevertheless, to the effect that the *Moser* rule requires that the alien, when executing the application for exemption, must knowingly and intelligently waive his right to citizenship in order to be barred from naturalization.

In its motion, the Service quoted from the decision in *Kahook* v. *Johnson, supra,* and a part of the quotation is as follows: "So long as it is not disputed on the record that he knew the effect of the request, that is, that he would acquire an exemption from military duty, it is not necessary that he also know that by obtaining such exemption he was thereafter subjecting himself to the disabilities such action entailed." We understand that the Service asserts that the *Kahook* decision holds that, if an alien knows that he will secure exemption from military service by executing DSS Form 301, it is unnecessary that he must also know that he will be ineligible to citizenship if he executes the Form. That, of course, appears to be the tenor of the statement we have quoted. However, the Service indicated that it was not relying on this principle. This statement in the *Kahook* decision was dictum. In any event, it does not correctly state the law since it is contrary to the Supreme Court's decision in the *Moser* case. The *Kahook* decision does not mention the *Moser* case, although it is probable that Kahook was attempting to bring himself within that rule.

Kahook contended that he was unable to secure the production of certain documents in possession of the Immigration authorities which would have disclosed that he could not read, write or speak English when he executed the DSS Form 301. The quotation by the Service from the *Kahook* decision includes language to the effect that, notwithstanding his inability to read or speak English, it did not follow that Kahook did not voluntarily and intelligently sign DSS Form 301. In other words, there was no testimony or evidence on the part of Kahook that he did not understand the effect and purpose of the DSS Form 301 when he signed it and, even if he could not read or speak English, this would not exclude the possibility that the matter might have been explained to him at the time and that he might have been aware of the result which would follow from the execution of the DSS Form 301.

The Service stated that this applicant attended public schools at Nogales, Arizona, from 1922 to 1927 through the seventh grade, and that only English was taught in these schools. It is not clear whether he attended through the seventh grade or to the seventh grade. The applicant had no English schooling until he came to the United States in February 1922 at the age of 13. Thereafter he attended school for 5 or 6 years until he was about 18 or 19 years old. Apparently he left school about 1927 or 1928, and it would seem that whatever knowledge of English he had acquired deteriorated thereafter since we observed that the present hearing was conducted in Spanish through an interpreter. In our previous order, we had considered the applicant's attendance at United States public schools

and we said that we had no reason to doubt his testimony that his knowledge of English was very limited in 1942, as well as at the present time. We are still of the same opinion.

Although we accept the applicant's testimony that he had a very limited knowledge of English in 1942, the important consideration is not his ability to understand or read English but whether he was or was not aware of the two alternatives. These were described in *Moser* as "a choice of exemption and no citizenship or no exemption and citizenship." We believe it is clear from the *Moser* decision, as well as the cases decided subsequently, that an alien must have knowingly and intentionally waived his rights to citizenship and must have had the opportunity of making an intelligent election between the two courses. In this applicant's case, it is apparent that he was aware that he was claiming exemption from military service on the ground of alienage. However, he testified that he did not read DSS Form 301 and that no one informed him that the signing of this Form would result in making him ineligible to citizenship. Hence, there is in this case only the factual question of whether the applicant was or was not aware on May 25, 1942, that he would become ineligible to citizenship if he signed DSS Form 301. Obviously the Service believes that he was aware of this fact. When we previously considered this case, we weighed the applicant's testimony against his interest in the outcome of the proceeding. We note that the applicant made no attempt to conceal his prior residence in the United States but specifically stated in his application for immigrant visa that he had resided at Nogales, Arizona, from February 8, 1922, until November 1942, which indicated that he had been in this country at a time when he was subject to the provisions of the Selective Training and Service Act of 1940, as amended. In our prior order, we concluded that the applicant was not aware when he executed DSS Form 301 that such action would debar him from citizenship. After careful consideration of the contentions and argument in the motion of the Service, we are still of the same opinion, and we hold that the applicant's case is within the rule stated in *Moser* and that he is not excludable under 8 U.S.C. 1182(a)(22).

In its motion, the Service quoted section 315(b) of the Immigration and Nationality Act and stated that the alien had attacked the record which the statute intended to be conclusive. There is no merit in this contention. Section 315(b) makes the records of the Selective Service System conclusive as to whether an alien was relieved from military service on the ground of alienage. This applicant was relieved on that ground and he does not contend otherwise. There is no other factor which is made conclusive by section 315(b), and it has no application, therefore, to the question involved in this applicant's case.

The Service stated at page 5 of its motion: "The significance of this appellant's departure to Mexico in November 1942, after 20 years of residence in this country, and his letter to the Selective Service written on August 24, 1943, stating that he no longer owed any allegiance to the United States, was not willing to serve in the United States Army, and understood the consequences of this decision, cannot be overlooked." Apparently the Service is in error in asserting that these statements are contained in the applicant's letter of August 24, 1943, to his local draft board. That letter is not part of the present record. However, Mr. O—'s letter of October 6, 1960, (part of Exh. 6) mentions the applicant's letter of August 24, 1943, but indicates only that his letter informed the draft board that he was residing in Mexico and that under the circumstances he considered himself exempt from complying with the Selective Service law.

The remarks, asserted by the Service to be in the applicant's letter of August 24, 1943, actually appear in his statement to a special agent of the Federal Bureau of Investigation on September 6, 1943. When a copy of this statement was exhibited to the applicant, he said that he preferred to have it translated in Spanish; he then stated that the fifth paragraph (which contains the remarks about not owing allegiance, unwillingness to serve in the United States Army, and understanding the consequences) was not in accordance with his statements to the special agent; and that the statement was not translated to him at the time of the interview. Counsel objected at the hearing to the introduction in evidence of Exhibit 7 and also referred to this matter in his brief. Exhibit 7 contains only typed signatures of the applicant and the special agent of the Federal Bureau of Investigation and there is a statement by the special inquiry officer that it is a true copy from the contents in the Service file. There is nothing to show why the statement in the Service file was not introduced into evidence. Since our decision is in favor of the applicant, we need not determine whether the copy of the statement was or was not admissible. In any event, we do not regard the applicant's statement of September 6, 1943, as being particularly material since it contains no statement as to whether, even at that time, the applicant was aware that the signing of DSS Form 301 rendered him ineligible to citizenship. In addition, the important consideration is whether the applicant was aware on May 25, 1942, that he would be ineligible to citizenship if he signed the DSS Form 301.

The applicant's departure to Mexico in November 1942 and the information in the statement of September 6, 1943 had been considered by us when we rendered the decision of May 22, 1961, and we do not regard these matters as constituting a basis for altering our prior determination. The applicant was exempted from military

service on the ground of alienage on May 27, 1942, and he was not reclassified I-A until August 4, 1943. It seems apparent to us that his departure from the United States had nothing to do with his liability for military service. He had left his employment in the United States on November 23, 1942, upon the death of his mother and resided and worked in Mexico from that time until March 31, 1960, when he was admitted to the United States for permanent residence.

Insofar as concerns that part of the statement quoted from the Service motion which is to the effect that the applicant said that he no longer owed any allegiance to the United States, there is nothing to indicate that this applicant at any time owed allegiance to the United States inasmuch as he has always been a citizen of Mexico. With respect to the applicant's statement that he understood the consequences of his decision, the Service does not indicate what it interprets this to mean. The dissenting opinion of May 22, 1961, apparently assumes that, when the applicant stated that he understood the consequences, he meant that he understood that a consequence of signing DSS Form 301 was ineligibility to citizenship. If the applicant was aware of that fact in August or September 1943, it would not show that he was aware of the matter on May 25, 1942. More important than that, however, is the fact that there is no basis for assuming that the use of the word "consequences" refers to ineligibility to citizenship inasmuch as it could just as probably refer to his understanding that he might be criminally prosecuted under the Selective Training and Service Act if he returned to the United States or that he might be inadmissible to the United States. Under the circumstances, we adhere to our previous conclusion that the applicant's statement of September 6, 1943, is of little value in determining whether the applicant was or was not aware on May 25, 1942, that the application for exemption from military service would render him ineligible to citizenship.

We stated above that we would comment on two contentions of counsel. First, he contends that the applicant should have been advised concerning the possibility of exclusion at the time he sopke to the immigration officer prior to his departure for Mexico and that the failure to so inform him constituted entrapment. Although this is an exclusion proceeding arising from the applicant's visit to Mexico for a few hours, a deportation proceeding could have been instituted even if he had not departed. The second contention is that there was no finding by the special inquiry officer that this applicant executed DSS Form 301 with knowledge that he would be thereby debarred from citizenship as required by the ruling in *Brunner* v. *Del Guercio*, 259 F.2d 583, 586 (C.A. 9, 1958). Since our conclusion is favorable to the applicant, these contentions of counsel need not be further discussed.

**ORDER:** It is ordered that the motion for reconsideration, except as reconsidered herein, be and the same is hereby denied.

**Allen R. Cozier, Member, Dissenting:**

For essentially the same reasons which prompted my concurrence in the dissent to the prior majority opinion of May 22, 1961, sustaining the alien's appeal in this case, I must again express my disagreement with the instant majority decision denying the Service motion for reconsideration.

I am in complete accord with the majority's assertion that there is no legal question involved in this applicant's case and that the decision must turn on the question of whether, under the facts of his case, he does, or does not, come within the legal rule enunciated in the *Moser* case. I am simply unable, however, to place that degree of credence in the alien's self-serving declarations which moved the majority of the Board to place this case within the rule in *Moser*, and I would, therefore, grant the Service motion.

**Robert E. Ludwig, Member, Dissenting**

I join in the dissent filed by Board Member Allen R. Cozier from the majority decision of the Board denying the Service motion for reconsideration.

In support of my dissent, I particularly desire to point out the decision of the United States District Court for the Northern District of California, Petition 137140, dated March 30, 1960, in the case of *Alfons Simon Keil*, affirmed by the United States Court of Appeals for the Ninth Circuit, *Keil v. United States*, 291 F.2d 268 (1961). This case was mentioned in the majority decision, but without discussion. In the instant case the principal contention of the respondent was that his signing of DSS Form 301 should bring him within the ruling stated in *Moser v. United States*, 341 U.S. 41, in that he had insufficient knowledge of the English language to understand the import of what he was signing. In my dissent to the decision on the merits dated May 22, 1961, I pointed out the reasons why I thought this contention of the respondent was ineffective. (See my dissent of May 22, 1961, pages 1–2.)

Even if we accept the conclusion of the majority that the respondent's lack of knowledge of the English language was such as to preclude him from having an effective knowledge of the consequences of executing DSS Form 301, we would still, under the reasoning laid down in the *Keil* case, be required to reach a conclusion that the respondent was shouldered with the full consequences of his act. Quoting from the decision in the *Keil* case:

At the hearing before this court witnesses were called, and testified that they knew petitioner and his wife over the period of time from August 1953,

727

and subsequently through 1954; that petitioner spoke no English; that it was from one to two years before he understood English; that petitioner's wife did not speak well, but that she knew more and could speak English much better than petitioner; that she did not comprehend the English language fully through the year 1954; that petitioner had to be helped to understand things, and that his wife did not understand too well. This testimony came from neighbors, the landlady, and people associated with the wife of petitioner in her work as a candy dipper.

Petitioner's wife testified at the hearing before the court that when she and her husband were confronted with the application for exemption after he had applied for citizenship and were shown the application by the naturalization examiner they had no recollection of ever having seen or executed such a document previously.

The issue for this court to determine is whether or not petitioner knowingly and intelligently executed the exemption application, and at that time petitioner had an opportunity to freely and intelligently choose between applying for exemption and waiving his right to citizenship or not applying for exemption and remaining eligible for citizenship and military training and service. The evidence submitted by the petitioner does not finally answer this question. The petitioner at the time the application for exemption was filled out had been in this country but six months. The testimony of the petitioner, his wife, neighbors, and a landlady shows that his ability to speak and understand English was severely limited. It need not, however, be concluded that because the petitioner did not understand English that he necessarily did not understand the exemption application at the time it was filled out even though such form was in English. Direct evidence as to the understanding of the petitioner at the time the exemption application form was completed is slight. Both petitioner and petitioner's wife testified that they did not remember having filled out the form or even having seen it before the hearing upon the petitioner's citizenship application on June 30, 1959, even though the form was admittedly in the handwriting of the petitioner's wife and bore the signature of the petitioner.

The record indicates that the petitioner had the exemption form in his possession between six to nine days before it was returned to the draft board. There is no evidence that the petitioner consulted his brother Willibald, who had two days before prepared and executed the longer, more detailed Selective Service Questionnaire; there is no evidence that the petitioner consulted the aunt who accompanied him to the draft board, or that the petitioner consulted the draft board or the German Consul concerning the form. The failure to consult with anyone other than his wife is of itself inconclusive on the question of the petitioner's understanding of the exemption application itself. However, the form itself correctly, accurately and completely filled out, constitutes at least some evidence that the person who filled out the form understood the language appearing on its face. Petitioner furnished correctly such information as his local draft board number, alien registration number, nationality, and the country under whose treaty exemption was claimed. This form, signed by him, designated by the Department as C-294, contains upon its face a copy of section 315 of the Immigration and Nationality Act of 1952, which informed the reader that one applying for exemption on the ground that he is an alien and is relieved from military service on such ground "shall be permanently ineligible to become a citizen of the United States." Upon evidence presented, the court finds that the petitioner did knowingly and intelligently waive his right to citizenship.

This is a recent decision in the Ninth Circuit, the Circuit Court in which respondent resides, and it is controlling in this case. Even accepting the conclusion of the majority that the respondent's lack of knowledge of the English language precluded him from having an effective knowledge of the consequences of his act, it is my opinion that the reasoning of the court in the *Keil* case, *supra*, nevertheless charges him with full responsibility therefor. Accordingly, it is my conclusion that the motion of the Immigration and Naturalization Service should be granted.

## BEFORE THE COMMISSIONER
(December 1, 1961)

**DISCUSSION:** There is no dispute on the facts. Appellant, a native and citizen of Mexico, resided in the United States from 1922 to 1942. He attended public school here up to or through the seventh grade. On May 20, 1942, he was classified as available for military service by his local draft board. He testified that he then went to the Mexican Consulate in Nogales, Arizona, was told he did not have to serve in our armed forces, and was advised to obtain DSS Form 301, Application by Alien for Relief from Military Service. He obtained the Form from his draft board, had it filled in at the Mexican Consulate, and then took it to the clerk at the local board before whom he signed and filed it on May 25, 1942.

The Form recited on its face that the making of the application would debar him from becoming a citizen of the United States. He testified he did not read the Form; that neither the Mexican Consulate nor the draft board informed him that his action would debar him from citizenship. On May 27, 1942, he was exempted from service by the local board. Thereafter, when Mexico became a co-belligerent, he was ordered to report for physical examination and at that time it was discovered that he had left the United States and was residing in Mexico. By letter dated August 24, 1943, he advised his local board of his having departed and that under the circumstances he considered himself exempt from any obligation for complying with the Selective Service law (Exh. 6).

On these facts the Board has found appellant not ineligible to citizenship by virtue of the filing of the DSS Form 301 under the rule in *Moser* v. *United States*, 341 U.S. 41. This ruling is based in turn on (1) appellant's limited knowledge of English, (2) not reading the application executed by him, and (3) not having the application explained to him.

## *ISSUE*

Does appellant's present testimony that he did not know and understand the contents of the DSS Form 301, insofar as it warned

against ineligibility to citizenship, bring him within the rule of the *Moser* case, where there is no evidence that he was misled into executing that document in the belief that he would not jeopardize citizenship, and in the absence of evidence that he did not have full opportunity to make an intelligent choice?

## *ARGUMENTS*

It is submitted that the reliance on *Moser*, *supra*, is misplaced. Moser went to his legation for aid in receiving deferment under a treaty. Through the legation he was furnished a revised DSS Form 301. The Form did not contain a statement that he would be debarred, but a footnote quoted the applicable law. The legation specifically informed him that he would not thereby waive his right to apply for citizenship. He signed the document believing that he was not thereby precluded from citizenship. He was lulled into a misconception of the legal consequences of the application with respect to eligibility to citizenship and, therefore, had no "opportunity to make an intelligent election."

This applicant never sought advice concerning eligibility to citizenship in connection with obtaining military exemption. He was given no advice and expressed no interest in the subject of citizenship at the time. He was concerned with one thing only, as evidenced by the filing of the document and his subsequent actions in taking the necessary steps to avoid service. Even his present self-serving testimony that he would not have signed the document had he known it would render him ineligible for citizenship is refuted by his testimony that he made no inquiry at the consulate, nor any place else, in this connection, at the time that he executed the document. As contrasted with *Moser*, this appellant had *every* "opportunity" to learn if he was debarring himself from citizenship. No one misled him—he simply acted pursuant to his desire to be exempted.

Apart from the difficulty in accepting a ruling that in the face of seven years of schooling in American schools at an early age, and 20 years over-all of residence in the United States, appellant's knowledge of English was so limited that he could not understand the plain warning in the DSS Form 301—a finding based solely on appellant's mere assertions to that effect—the appellant admits of no effort to read the DSS Form 301 himself, or that he requested anyone, including the consulate or the draft board, to read or explain it to him.

It is the essence of the instant ruling that one who signs a form for exemption, without regard to its effect, except to the extent that it relieves him from military service, thereby brings himself within the holding in *Moser*. Even if it were assumed that this appellant could not read English, and even if it were conceded that

he did not know that he would become ineligible to citizenship, the Service is unaware of judicial authority that opportunity for intelligent choice is lacking, or that an alien can successfully claim unawareness of legal consequences, when with full opportunity to do so he does not read the form, makes no effort to read it, makes no request of anyone to read it to him, seeks no advice or assistance as to the contents of the form, and, in executing the form was not offered or given any information which misled him. Additionally, such a ruling is "in effect to rule that the Local Board * * * accepted a document which had no valid inception" and "in the absence of testimony from the clerk or any member of the Board" constitutes "an arbitrary ruling upon the methods pursued by the Board in discharging its difficult functions, which is a position that could be justified only under very unusual circumstances." *Petition of Miranda*, 111 F. Supp. 481 (D.C., E.D. N.Y., 1953).

The Form speaks for itself. Strong affirmative evidence should be required to overcome it. The Congress made this clear in section 315 of the Immigration and Nationality Act. Obviously, the warning on the face of the Form is meaningless if all that is required to overcome it is self-serving testimony by the alien, 20 years after execution, that he did not read the document or know it would make him ineligible for citizenship.

The issue is one of far-reaching consequences in both immigration and naturalization proceedings, The present decision enunciates an interpretation which will render the Service impotent to refute a claim that in signing DSS Form 301 an applicant was unaware that he was thereby debarred from citizenship. As pointed out in the Service motion for reconsideration of June 9, 1961, the decision is contrary to the overwhelming weight of judicial authority. Particular reference is made to *Kahook* v. *Johnson*, 273 F.2d 413 (C.A. 5, 1950), and *Keil* v. *United States*, 291 F.2d 268 (C.A. 9, 1961). The latter decision comes from the very circuit in which this applicant for admission resides and presents the anomalous situation that the Service would have to recommend the granting of a petition for naturalization by this applicant, in the very circuit where the Court, in wholly unambiguous language, has said that naturalization would be denied.

Because the instant ruling does violence to the intent and purpose of section 315 of the Immigration and Nationality Act, and is an unwarranted extension of the holding in the *Moser* case, contrary to the weight of judicial precedent, and because of the far-reaching impact of the ruling on other cases, it is requested that the case be certified to the Attorney General.

*Request is hereby made* that pursuant to the provisions of 8 CFR 3.1(h)(1)(iii) the instant case be referred to the Attorney General for review.

731

**DISCUSSION:** By majority decisions of the Board, we sustained the alien's appeal on May 22, 1961, and on November 14, 1961, a motion of the Service for reconsideration was denied. The matter is now before us pursuant to the request of the Service on December 1, 1961, that the case be referred to the Attorney General for review under 8 CFR 3.1(h)(1)(iii), and the Service has also asked that a supplemental memorandum dated December 11, 1961, be attached to its original memorandum.

The applicant is a 53-year-old married male, native and citizen of Mexico, who was admitted to the United States for permanent residence on March 16, 1960. On August 6, 1960, after an absence of a few hours in Mexico, he applied for admission as a returning resident and was excluded by a special inquiry officer on the ground stated above.

The issue in this case is whether the applicant is permanently ineligible to become a citizen of the United States under the provisions of section 315 of the Immigration and Nationality Act (8 U.S.C. 1426). We do not regard the issue as being that shown on page 2 of the Service memorandum of December 1, 1961, since it was stated there in the form of a question which was based on the erroneous hypothesis that there was no evidence concerning two matters.

On page 1 of its memorandum dated December 1, 1961, the Service gives its view of the facts. The first sentence of the memorandum is: "There is no dispute on the facts." This is incorrect, and we believe we made it plain in our previous orders that the question involved in this case is *solely* one of fact. Our authority to decide factual issues was affirmed by a former Attorney General on June 6, 1956, in *Matter of B—*, 7—1, 36, and the Service does not claim in this case that we lack such authority. Since the Service has failed to perceive that this case involves only a factual question, and in order that there may be no further misunderstanding, we have set forth our view of the facts in some detail in this decision and in our formal findings of fact hereinafter.

The applicant previously resided in the United States from 1922 until 1942 and registered under the Selective Training and Service Act of 1940. He was originally placed in a IV–C classification on June 11, 1941, since he was not liable for military service under the law then in existence. On May 20, 1942, he was placed in Class I. The applicant testified that, upon receiving a notice to appear for a medical examination, he went to the Mexican Consulate for advice and was informed that he was not obligated to serve in the armed forces of the United States and that he should obtain DSS Form 301 from his draft board. He obtained the Form and took it to the

Mexican Consulate where it was filled out and he then signed the Form before an employee of the draft board. He was positive in his testimony that he did not read the Form; that no one at the Mexican Consulate or at the draft board informed him that the signing of the application would bar him from becoming a citizen of the United States; and that no statement whatever was made to him that this application would have any effect upon his eligibility for citizenship. He testified that he would not have signed the Form if he had known that such action would bar him from becoming a citizen.

The DSS Form 301 was an application by a citizen of a *neutral* country to be relieved from training and service in the Armed Forces of the United States. The applicant executed this Form (Exh. 5) on May 25, 1942, and it contains a printed statement that the making of the application will debar the person from becoming a citizen. On May 27, 1942, the applicant was exempted from service by his draft board and was again placed in Class IV–C. Actually, Mexico was then no longer a neutral country since it had declared war on Germany, Italy and Japan on May 22, 1942. However, a letter of the Selective Service System dated October 6, 1960 (part of Exh. 6), indicates that it had not officially listed Mexico as a co-belligerent country until August 3, 1943. On the following day, the applicant was changed from Class IV–C to Class I–A.

The applicant left his employment in the United States on November 23, 1942, upon the death of his mother (apparently in Mexico) and he resided and worked in Mexico from that time until March 31, 1960, when he was admitted to the United States for permanent residence. Since he had been exempted from military service on May 27, 1942, and was not reclassified in I–A until August 4, 1943, it seems evident that his departure from the United States in November 1942 was not due to fear of imminent induction but was because of the death of his mother as he stated.

The applicant had no English schooling prior to coming to the United States in February 1922, at the age of 13. He then attended public schools at Nogales, Arizona, for 5 or 6 years until he was about 18 or 19 years old, to or through the seventh grade. He left school about 1927 or 1928, and it would seem that his knowledge of English deteriorated thereafter since the present exclusion hearing was conducted in Spanish through an interpreter.

On page 2 of its memorandum, the Service stated that our ruling was based on three factors—the applicant's limited knowledge of English; the fact that he did not read the application; and "not having the application explained to him." On page 3, the Service said that no one misled this applicant. In our order of November 14, 1961, we stated that, although we accepted the applicant's testi-

mony that he had a very limited knowledge of English in 1942, the important consideration was not his ability to understand or read English but whether he was or was not aware of the two alternatives mentioned in *Moser* v. *United States*, 341 U.S. 41 (1951), that is, "a choice of exemption and no citizenship or no exemption and citizenship." We also said that there was only the factual question of whether he was or was not aware on May 25, 1942, that he would become ineligible to citizenship if he signed DSS Form 301. We have not said that this Form was not "explained to him." Actually, the situation here is that the applicant *was* informed that he could obtain exemption from military service by executing DSS Form 301, but *was not* informed that the signing of the Form would result in making him ineligible to citizenship. Hence, the furnishing of only part of the information and the failure to inform him as to the consequences of signing the application did mislead this applicant so that he did not have the opportunity of making an intelligent election.

In *Moser* v. *United States, supra*, the Court stated at page 47:

Petitioner did not knowingly and intentionally waive his rights to citizenship. * * * [H]e never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness. * * * To hold otherwise would be to entrap petitioner.

On page 4 of its memorandum of December 1, 1961, the Service asserts that our decision "is contrary to the overwhelming weight of judicial authority." That statement is erroneous. In this connection, the Service made particular reference to *Kahook* v. *Johnson*, 273 F.2d 413 (C.A. 5, 1960), and *Keil* v. *United States*, 291 F.2d 268 (C.A. 9, 1961). In our order of November 14, 1961, we discussed fully this contention of the Service, as well as the *Kahook* decision. We there stated that the *legal* question had been authoritatively answered by the Supreme Court's decision in *Moser* v. *United States, supra*, and that, since that time, the inquiry was whether or not the *facts* of the particular case brought it within the *Moser* rule.

In the motion of June 9, 1961, the Service had relied on four district court decisions in each of which it was held that the alien *was not* within the *Moser* rule. We stated, in our order of November 14, 1961, that in other cases the courts had reached a contrary conclusion to the effect that the alien *was* within the *Moser* rule and, as examples, we cited the following: *Machado* v. *McGrath*, 193 F.2d 706 (C.A. D.C., 1951); *Petition of Berini*, 112 F. Supp. 837 (E.D. N.Y., 1953); *Petition of Sally*, 151 F. Supp. 888 (S.D. N.Y., 1957); and *In re Bouchage's Petition*, 177 F. Supp. 887 (S.D. N.Y., 1959).

As we stated in our previous order, *Machado* v. *McGrath, supra*,

shows that the *Moser* rule has not been limited to factual situations precisely identical with Moser. This is also true of the *Bouchage* case in which that alien had received misleading information from a draft board member. The court held (p. 897 of the opinion) that he was within the *Moser* rule and granted his petition for naturalization, notwithstanding the fact that the DSS Form 301 which Bouchage signed was not the revised form which Moser had signed, and notwithstanding the fact that the court found that Bouchage knew, when he signed the Form, that it contained the clause stating that he understood that the making of the application debarred him from citizenship.

The Service seeks to differentiate the applicant's case from that of Moser by stating that Moser signed DSS Form 301 (revised), whereas the Form signed by this applicant contained the printed statement that the making of the application would debar him from becoming a citizen. As we have already indicated, it is obvious from *In re Bouchage's Petition, supra*, that this is not a valid distinction. As a matter of fact, *Petition of Moser*, 182 F.2d 734, 736 (C.A. 2, 1950), shows that it was not until March 16, 1943, that DSS Form 301 was revised, and the revised form was not even in existence when this applicant applied for exemption on May 25, 1942. Furthermore, in *Petition for Naturalization of Bruce*, 163 F. Supp. 493 (S.D. N.Y., 1958), the district court denied the petition for naturalization principally on the ground that Moser had signed the revised DSS form 301 and Bruce had signed the original Form which contained the warning about ineligibility for citizenship. The alien appealed from that decision. On motion of the Government in the Court of Appeals, that court vacated the judgment of the district court and remanded the case for further proceedings. Thereafter, the Government withdrew its objection to the granting of Bruce's petition and he was admitted to citizenship on May 11, 1959.

The Service states that this applicant never sought advice concerning his eligibility for citizenship in connection with obtaining exemption from military service and that Moser went to his legation for aid in obtaining exemption. This applicant did, in fact, go to the consular officer of his government for information and he followed that officer's advice in signing DSS Form 301. Moser was reclassified I-A on January 11, 1944, and it seems clear that he was well aware that the original DSS Form 301 contained the statement that the making of the application would render him ineligible to citizenship since he advised his local board that he had taken steps "to be released unconditionally" from service. This applicant, on the other hand, did not know that the signing of the Form would bar him from becoming a citizen or that it would have any effect

735

upon his eligibility for citizenship. Moser was apparently a well-educated man and was a commissioned officer in the Swiss army. Under these circumstances, we find it difficult to understand how the Service can conscientiously urge that this applicant should have inquired whether signing the Form would debar him from citizenship when he was not even aware of that possibility.

On page 3 of its memorandum, the Service again cited *Petition of Miranda*, 111 F. Supp. 481 (E.D. N.Y., 1953), one of the four district court decisions which had been cited in its previous motion, and parts of certain sentences in that decision were quoted. When these are considered in the context of the entire opinion, we do not believe that they are of any particular value in this applicant's case. For example, the court stated: "To accede to this view would ̣ ̣quire the court in effect to rule that Local Board 24 accepted a document which had no valid inception." Immediately preceding that was the statement that Miranda said that he did not then speak English; that he did not read the paper (DSS Form 301); that it was not translated or otherwise explained to him; and that, therefore, it should be disregarded. This seems to mean that, if the court had believed Miranda's testimony, it would have had to hold that the DSS Form 301 "had no valid inception." The court did not, however, make any specific finding as to whether Miranda was or was not aware that his DSS Form 301 contained the statement that he would be barred from citizenship but it is obvious that the court, in denying his petition, found against him on the facts.

We stated above that the Service had requested that a supplemental memorandum dated December 11, 1961, be appended to its memorandum of December 1. There was attached to the supplemental memorandum a decision of the United States District court for the Eastern District of New York dated December 1, 1961, relating to the petition for naturalization of Jaime Diaz, and the Service stated that the district court "quoted with approval" certain statements made by its superior court in *United States* v. *Kenny*, 247 F.2d 139 (C.A. 2, 1957). There is no apparent reason why the Service could not have relied on the decision of the Court of Appeals concerning Kenny rather than on a district court decision which merely quoted language from the *Kenny* decision.

In the *Kenny* case, the alien had not used a Form but had written a letter to his draft board on January 14, 1953, requesting exemption. Five months later, the draft board sent him a letter calling attention to the provisions of section 315 of the Immigration and Nationality Act. It was in this connection that the Court of Appeals, at page 143, made the statement relied on by the Service to the effect that section 315 may not be interpreted to mean that its provisions shall come into effect only when the application for exemption is

made upon a prescribed form or after a warning as to its effect.

The Court of Appeals in the *Kenny* decision had made the following statement immediately after the extract which was quoted in the *Diaz* case: "However that may be, in this case Kenny did not advance as his excuse ignorance of the statutory bar. Instead, his excuse was that he thought the bar not applicable to him." This seems to indicate that the Court of Appeals did not place its decision on the language relied on by the Service but that its decision was based upon the fact that Kenny had not claimed that he was ignorant of the fact that a request for exemption would bar him from citizenship. The court went on to say that, even after he had been directly notified of the statutory bar, he continued to enjoy the exemption for over a year before he withdrew his request for exemption. This applicant's case is distinguishable from Kenny because he claims he did not know of the statutory bar and did not know that claiming exemption would have any bearing on his eligibility for citizenship.

There also appears to be a question as to whether the *Kenny* case was correctly decided because he had claimed exemption as a treaty alien on January 14, 1953, and it is now the clearly-defined administrative rule that a claim of exemption as a treaty alien subsequent to the Selective Service Act of 1948 and prior to April 24, 1953, did not render the alien ineligible to citizenship. This is illustrated by *In re Elken's Petition*, 161 F. Supp. 823 (E.D. N.Y., 1958), and the unreported case of *George Alfred Duerst* who filed petition for naturalization No. 692233 in the United States District Court for the Southern District of New York. Elken claimed exemption as a treaty national on November 4, 1952, and Duerst on January 6, 1953. Their petitions for naturalization were denied on May 8, 1958, and July 14, 1958, respectively, and both appealed. *In re Elken's Petition, supra*, contains the statement that the case is analogous to that of *United States* v. *Kenny, supra*, and the Kenny case was also relied on in the Duerst decision. The two district courts which denied naturalization to Elken and Duerst are in the Second Circuit and, since the *Kenny* case was decided in that Circuit, it was a binding precedent. While the appeals of Elken and Duerst were pending, the Government requested the Court of Appeals to remand the petitions to the district courts for reconsideration following which the Service withdrew its opposition to the granting of naturalization and both were admitted to citizenship.

*In re Naturalization of Healy*, 183 F. Supp. 651 (N.D. Cal., 1960), related to a claim for exemption by a treaty national on January 23, 1953, and the court concurred in the administrative view that such aliens are not barred from naturalization. In view of the foregoing, as well as the fact that the statements in *Kenny* on which the Service relied appear to be dicta, we do not believe they are controlling in

737

This applicant's case, particularly insofar as they might be considered contrary to the holding in the *Moser* case.

On page 4 of its memorandum of December 1, 1961, the Service stated that our decision is "an unwarranted extension of the holding in the *Moser* case." We have not, of course, extended the ruling in the *Moser* case. In our opinion, that case must be considered as holding that it is essential that the alien must have "knowingly and intentionally waived his rights to citizenship," and that he must have had an opportunity to make an intelligent election between "exemption and no citizenship or no exemption and citizenship." The Service has not and cannot dispute that this is, in fact, what the *Moser* case holds.

The Service also stated that the applicant's residence is in the Ninth Circuit in which *Keil* v. *United States, supra,* was decided and that there is "the anomalous situation that the Service would have to recommend the granting of a petition for naturalization by this applicant, in the very circuit where the Court, in wholly unambiguous language, has said that naturalization would be denied." The latter part of the quoted statement is indeed far fetched. The court did not, of course, say that it would deny naturalization to every alien who signed DSS Form 301. As a matter of fact, the court specifically said that *Moser* v. *United States, supra,* "requires that the alien, when executing the application for exemption, must knowingly and intelligently waive his right to citizenship in order to be barred from naturalization." The district court made a finding that Keil "did knowingly and intelligently waive his right to citizenship" and the Court of Appeals said that the decision of the lower court found ample support in the evidence. We cited the *Keil* case in our order of November 14, 1961, and stated that it was to the same effect as the four district court decisions cited by the Service. In other words, the case is simply one in which the court held that the alien was not within the *Moser* rule based on the particular facts in Keil's case. Hence, that decision does not control other cases in which the facts are not the same.

There is no assurance that this applicant will ever apply for citizenship or that he would meet other requirements for naturalization unrelated to the possible bar of section 315 of the Immigration and Nationality Act. In the event that he does file a petition for naturalization, we assume that the Service will bring all of the facts to the attention of the naturalization court, including the fact that he signed DSS Form 301. If that court does not agree with our findings of fact in this exclusion proceeding, we have no doubt that it will disregard our findings and decide the case on its view of the facts.

The Service describes the applicant's testimony as self-serving. It is true that any testimony given by an applicant for admission to

the United States will usually be either against interest or self-serving. This does not mean that an alien's self-serving statements must be automatically excluded from consideration. In our previous order, we stated that at the time we originally considered the case we had weighed the applicant's testimony against his interest in the outcome of the proceeding. When he applied for his immigrant visa in 1960, he made no attempt to conceal his prior residence in the United States during a time when he was subject to the provisions of the Selective Training and Service Act, but specifically informed the American Consul concerning his residence at Nogales, Arizona, from 1922 until November 1942. After considering all the factors, we previously found that the applicant was not aware, when he executed DSS Form 301, that such action would bar him from citizenship, and we adhere to that finding.

The Service has also asserted a fear that our decision will render it impotent to refute a claim by an applicant that he was not aware that signing DSS Form 301 would bar him from citizenship. We believe it should have been clear to the Service from our previous decisions that this applicant's case involved only a factual issue which we had determined in his favor. Hence, there is no reason why our decision here should have any effect on the decision in other cases which must be determined on the facts peculiar to them. Even in cases in which the facts might be somewhat similar, it would not follow that the alien must necessarily be held eligible for citizenship. In other words, here we believe the alien's testimony that he was not aware, when he signed DSS Form 301, that the signing of the Form would bar him from citizenship but this would not preclude a special inquiry officer or naturalization examiner from finding in some other case that the alien was aware of the fact even though he might claim to the contrary.

We observe that the special inquiry officer did not make a finding that the applicant executed DSS Form 301 with knowledge that he would be thereby debarred from citizenship, as required by the ruling in *Brunner* v. *Del Guercio*, 259 F.2d 583, 586 (C.A. 9, 1958). We adopt the special inquiry officer's findings of fact numbered (1) and (2) and make the following additional findings of fact:

(3) On May 25, 1942, the applicant executed an application for relief from military service (DSS Form 301), and he was exempted from service by his local board on May 27, 1942;

(4) The DSS Form 301 was prepared for the applicant by an officer or employee of the Mexican Consulate and the applicant thereafter signed the Form before an employee of the draft board at Nogales, Arizona;

(5) The applicant did not read DSS Form 301 before he signed it;

(6) He was not informed either at the Mexican Consulate or at the draft board that the signing of DSS Form 301 would bar him from becoming a citizen of the United States or would have any effect upon his eligibility for citizenship;

739

(7) The applicant did not have any knowledge, at the time he signed DSS Form 301, that the signing of the Form would bar him from becoming a citizen;

(8) The applicant would not have signed DSS Form 301 if he had known that such action would bar him from becoming a citizen;

(9) The applicant did not knowingly and intentionally waive his rights to citizenship.

Our conclusion of law is as follows:

(1) The applicant is not an alien ineligible to citizenship and is not excludable from admission into the United States under section 212(a) (22) of the Immigration and Nationality Act.

**ORDER:** It is ordered that this case be referred to the Attorney General for review in accordance with 8 CFR 3.1(h) (1) (iii).

### BEFORE THE ATTORNEY GENERAL
(June 18, 1962)

This is a proceeding to exclude an alien under section 212(a) (22) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182 (a) (22), on the ground that he is ineligible to citizenship. The asserted ineligibility is based upon section 315 of the Act, 8 U.S.C. 1426, which provides in substance that an alien who applied for and was exempted from military service because he is an alien is thereafter barred from eligibility for United States citizenship. The rule is qualified by the doctrine of *Moser* v. *United States*, 341 U.S. 41, which holds that in applying for exemption the alien must be in a position to make an intelligent choice between waiver of his eligibility for citizenship and liability for military service.

An applicant for admission into the *United States* has the burden of proving that he is not subject to exclusion. 8 U.S.C. 1361. Quite apart from this, one seeking to come within the exception to section 315 implied in *Moser* is in the same position as a party claiming the benefit of an exception to a general rule. The burden of proving an exception or exemption is upon the one asserting it. *Sherman Inv. Co.* v. *United States*, 199 F.2d 504, 507 (C.A. 8, 1952). Finally, the facts and circumstances surrounding an alien's negative claim that he did not intelligently choose between eligibility for service and eligibility for citizenship are peculiarly within the alien's knowledge. For this reason also, he must bear the burden of proof. Cf. *Tendler* v. *Jaffe*, 203 F.2d 14, 18, certiorari denied, 346 U.S. 817.

In view of the disposition of this case, it is not necessary to recite the facts in the record. The relevant procedural steps were as follows: On December 7, 1960, a special inquiry officer of the Immigration and Naturalization Service entered a decision concluding that the applicant was excludable from admission into the United States under section 212(a) (22) as an alien who is ineligible for citizen-

ship. This conclusion was based upon findings that the applicant had requested exemption from military service in the United States Armed Forces as a neutral alien, and that this request had been granted. The applicant appealed the inquiry officer's decision to the Board of Immigration Appeals which, on May 22, 1961, dividing 3–2, ruled for the applicant. The Board found that he was not aware that the disqualifying consequence of his request for exemption from service would be ineligibility for citizenship. The Immigration and Naturalization Service moved for reconsideration and the Board issued a second opinion, dated November 14, 1961, again holding for the applicant. The Service then requested that the case be referred to me pursuant to 8 CFR § 3.1(h)(1)(iii).

Although it did not expressly discuss the burden of proof, the opinion of the majority of the Board appears to have found that the evidence of record sustained the applicant's burden of bringing himself within the *Moser* rule; but two members concluded that his testimony concerning his understanding of the consequences of his application for exemption, which is crucial here, should not have been credited. On the motion for reconsideration, the majority viewed the issue as one of fact. Board Member Cozier dissented from the majority's disposition of the merits, but also observed "that there is no legal question involved in this applicant's case and that the decision must turn on the question whether, under the facts of his case, he does or does not come within the legal rule enunciated in the *Moser* case." Board Member Ludwig, who also expressed his own view of the matter, joined in this dissent.

The only issue for decision which I find in this case is whether, on its particular record, the majority or the dissenters are correct in their assessment of the facts leading to the conclusion that the alien had satisfied the burden imposed upon him. This is not ordinarily an issue appropriate for reference to me under the pertinent regulations. The record is one upon which reasonable men can differ and have differed. Further consideration of the question has established no general principle which could guide the disposition of other cases, or revealed any clear error on the part of the Board. In the circumstances, therefore, I affirm the decision in behalf of the applicant.

The Service has expressed the fear that the decision of the Board in this case may establish a precedent for future cases under which it will be helpless to refute self-serving testimony by an applicant that he was not aware that claiming exemption from military service could bar him from eligibility for citizenship. This is largely a question of credibility, which must be tested against all of the circumstances surrounding the claim of ignorance. These circumstances are especially important in proceedings before the Board, because

credibility must be determined without the benefit of demeanor evidence. In this case the Board's assessment of the applicant's testimony was balanced against all of the other factors in the record lending support to the testimony. A slight variation in those factors might well have convinced a majority of the Board that the applicant's claim of ignorance was not credible. In any event, I do not understand the Board's decision to establish a rule of proof for other cases, nor does this decision affirming it do so.